IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03094-REB-NYW

ESTATE OF LORETTA BARELA,
MARIA CRUZ,
EDDIE ROSA,
RAY ROSA,
CLEOTIDE ROLL,

       Plaintiffs,

v.

CITY AND COUNTY OF DENVER,
TIMMOTHY HUCKSOLL,
BRIDGET RHODES,
SCOTT CRAWFORD,
TIMOTHY PACKMAN,
OFFICER JENNIFER FRANCE,
OFFICER SUSAN MERCADO, and
CHRISTOPHER PEREA,

       Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE AND
ORDER REGARDING PENDING MOTIONS**
_____

Magistrate Judge Nina Y. Wang

      This matter is before the court on a number of pending motions:

(1) Defendant Christopher Perea's Motion to Stay ("Perea's Motion to Stay") [#41, filed

      April 2, 2015];

(2) Defendant City and County of Denver's (the "City") Motion to Dismiss [#42, filed

      April 3, 2015];

(3) Defendant Perea's Motion to Appoint Counsel [#48, filed April 17, 2015];

(4) Defendant Perea's Motion for Extension of Time [#49, filed April 17, 2015];

(5) Defendant Timothy Packman's Motion to Dismiss [#52, filed April 21, 2015];

(6) Defendant Packman's Motion to Stay Discovery ("Packman's Motion to Stay Discovery") [#54, filed April 23, 2015];

(7) Defendants the City, Timmothy Hucksoll, Bridget Rhodes, Scott Crawford, Jennifer France, and Susan Mercado's Motion to Stay Discovery [#60, filed April 27, 2015]; and

(8) Defendants Hucksoll, Rhodes, Crawford, France, and Mercado's ("Denver Defendants") Motion to Dismiss [#63, filed May 1, 2015].

These matters were referred to this Magistrate Judge pursuant to the Order Referring Case dated November 17, 2014 [#4] and multiple memoranda.[1]  This court has carefully considered the Motions and related briefing, the entire case file, the arguments offered at the June 12, 2015 Motions Hearing, and the applicable case law.   For the following reasons, this court respectfully RECOMMENDS that the Motions to Dismiss be GRANTED as to the constitutional claims and that the court DECLINE to exercise supplemental jurisdiction as to the state law claims.   Because of its Recommendation, this court orders that the Packman Motion to Stay is GRANTED; the City and Denver Defendants' Motion to Stay is GRANTED; the Perea Motion to Stay is GRANTED; the Motion to Appoint Counsel is DENIED; and the Motion for Extension of Time is GRANTED.

## FACTUAL BACKGROUND

Plaintiffs Estate of Loretta Barela, Marie Cruz, Eddie Rosa, Ray Rosa, and Cleotilde Roll, as parent and next friend of Jazmin Trujillo, filed a Complaint in this court on November 17, 2014, pursuant to 42 U.S.C. § 1983 asserting claims for constitutional violations arising from the

---

[1]  Specifically, those dated dated April 3, 2015 [#43], April 6, 2015 [#44], April 17, 2015 [#50], April 21, 2015 [#53], April 23, 2015 [#55], April 28, 2015 [#62], and May 1, 2015 [#64].

November 18, 2012 death of Loretta Barela.   For the purposes of considering the Motions to

Dismiss, the following recitation of facts from the Complaint are taken as true.   In the early

morning hours of November 18, Defendant Perea and Loretta Barela were engaged in a violent

dispute at the couple's home in Denver, Colorado.   [#33 at ¶ 2].   At approximately 2:00 a.m., a

partially clothed Ms. Barela fled the house seeking help and woke a neighbor from across the

street, Rita Espinoza, by pounding on her door.   [*Id.* at ¶¶ 4, 5].   After opening the door, Ms.

Espinoza retreated into her home in search of a shirt for Ms. Barela, and returned to witness

Defendant Perea dragging Ms. Barela by her hair across the street and into the couple's home.

[*Id.* at ¶¶ 6-7].   Ms. Espinoza dialed 911 and stated to the responding dispatcher, Defendant

Hucksoll:

> My neighbor came and was pounding on my door and she had pants on and no shirt
> on. Her boyfriend came out and was pulling her across the street. He locked the
> door and hitting her.   And she's a very small woman and he's a pretty big man.

[*Id.* at ¶ 8].   Defendant Hucksoll told Ms. Espinoza that "they would 'get the officers to go over

there.'"   [*Id.* at ¶¶ 9, 40].   Ms. Espinoza watched the Barela home for 45 minutes, noted that no

officers arrived, and called 911 a second time.   [*Id.* at ¶ 10].   The 911 dispatcher, Ms. Rhodes,

responded:

> Alright. Yeah, no. We haven't forgotten about you. We've just been extremely
> busy tonight…We do have a call for officers to head out and check on them – or
> check her I should say.

[*Id.* at ¶¶ 11, 46].   Approximately one hour and six minutes passed between Ms. Espinoza's first

call to 911 and when police were dispatched to the Barela home.   [*Id.* at ¶ 12].   Plaintiffs allege

that during the time between Ms. Espinoza's first phone call to 911 and when the police were

dispatched, dispatcher Defendant Packman reset the system timer three times and dispatcher

3

Defendant Crawford reset the system timer once, thereby delaying the police dispatch.   [#33 at ¶ 50].

Once dispatched, approximately four minutes passed between the time of dispatch and when the police arrived at the home.   [*Id.* at ¶¶ 12-13].   Ms. Espinoza observed the officers knock on the door and shine lights into the house before departing without further investigation, approximately eighteen minutes after arriving.   [*Id.* at ¶¶ 13, 56].

At 8:15 a.m. that morning, Defendant Perea contacted the Denver police to report that Ms. Barela was dead and he believed he had killed her.   [#33 at ¶¶ 14, 57].   Ms. Barela was later pronounced dead at the scene with an estimated time of death between 4:00 a.m. and 6:00 a.m., as a result of blunt force injury and strangulation.   [*Id.* at ¶ 58].   Defendant Perea was ultimately convicted of First Degree murder, First Degree Felony Murder, and Second Degree Kidnapping for the murder of Loretta Barela, was sentenced to four life sentences, and is currently serving a life sentence in the custody of the Colorado Department of Corrections.   [*Id.* at ¶¶ 15, 33].

Plaintiff Cruz is the daughter of Ms. Barela and the personal representative of the Estate of Loretta Barela.   [#33 at ¶ 20].   Plaintiffs Eddie and Ray Rosa are Ms. Barela's sons.   [*Id.* at ¶¶ 22-23].   Plaintiff Roll, as parent and next friend of Jazmin Trujillo, is the adoptive mother of Jazmin, the minor daughter of Ms. Barela.   [*Id.* at ¶ 24].   Plaintiffs plead that Defendants Hucksoll, Rhodes, Packman, and Crawford were employed and serving as Denver Police Dispatchers at the time of Ms. Barela's death.   [*Id.* at ¶¶ 25-28].   Plaintiffs further plead that Defendants France and Mercado were employed and serving as Denver Police Officers at the time of Ms. Barela's death.   [*Id.* at ¶¶ 29-30].

Ms. Barela lived in Denver Police District 4 ("District 4").   [#33 at ¶ 53].   In 2012,

District 4 averaged a time of less than fifteen minutes between dispatch receiving a 911 call and police arriving on the scene.   [*Id.* at ¶ 54].   In 2013, District 4 averaged a time of 16.32 minutes between dispatch receiving a 911 call and police arriving on the scene.   [*Id.*]   Plaintiffs allege that the only other reported crimes in District 4 on the night of November 17 and during the early morning of November 18 were one robbery and two traffic incidents.   [#33 at ¶ 107].   The two traffic incidents were resolved in less than one hour, according to the time when police were dispatched to the time they left the accident scene.   [*Id.* at ¶ 109].   Plaintiffs further allege that at least seven 911 Denver City employees, including the four dispatch Defendants, assessed Ms. Espinoza's two calls.   [*Id.* at ¶ 146].   Defendant Packman was allowed to resign; the other six employees remained in their employment positions "without public indication of discipline."   [*Id.* at ¶¶ 148-149].

## PROCEDURAL HISTORY

On March 13, 2015, Plaintiffs filed an Amended Complaint asserting the following claims: (1) Fourteenth Amendment due process violation as to the Denver Defendants and Defendant Packman; (2) Fourteenth Amendment violation of the Equal Protection Clause as to Defendants Hucksoll, Rhodes, Crawford, and Packman; (3) Deliberately Indifferent Training and Supervision and Deliberately Indifferent Failure to Adopt Policies Necessary to Prevent Constitutional Violations as to the City; (4) Willful and Wanton Conduct Resulting in Wrongful Death as to the City, the Denver Defendants, and Defendant Packman; and (5) Felonious Killing Resulting in Wrongful Death as to Defendant Perea.[2] [#33]. Plaintiffs invoke supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for the state law claims of Willful and Wanton Conduct and

---

[2] Plaintiff Estate of Loretta Barela ("Plaintiff Estate") alone asserts the First through Third claims and Plaintiffs Cruz, the Rosas, and Roll assert the Fourth and Fifth claims.

Wrongful Death.

Defendant Perea filed the Motion to Stay on April 2, 2015 [#41], arguing for a stay of this matter pending his criminal appeal of the conviction against him in state court regarding Ms. Barela's murder.  He filed the Motion to Appoint Counsel [#48] and the Second Motion for Extension of Time to Answer [#49] on April 17, 2015, asking the court to appoint him counsel and defer any deadline for the filing of an Answer until after such counsel is appointed.   The City filed its Motion to Dismiss on April 3, 2015 [#42].   The City Defendants filed their Motion to Stay Discovery on April 27, 2015 [#60].   Defendant Packman filed his Motion to Dismiss on April 21, 2015 [#52] and the Motion to Stay Discovery on April 23, 2015 [#54].   Defendants Crawford, France, Hucksoll, Mercado, and Rhodes filed their Motion to Dismiss on May 1, 2015 [#63].

On May 4, 2015, I presided over a Scheduling Conference at which I instructed Plaintiffs to submit a Notice with Defendant Perea's Notice of Appeal and any associated papers related to the criminal appeal for consideration by the court in conjunction with the Motions to Stay[3], and advised that the court would not enter a Scheduling Order until Defendant Perea had been given an opportunity to review the proposed order.   [#65].   The following day, District Judge Blackburn issued a Trial Preparation Conference Order setting a ten-day jury trial to commence June 6, 2016. [#67].

Between April and June, the Parties engaged in significant motions practice, which included Plaintiffs filing responses to: Perea's Motion to Stay [#51]; the City's Motion to Dismiss [#56]; Perea's Motion for Extension of Time [#68]; Packman's Motion to Dismiss [#71]; Packman's Motion to Stay Discovery [#72]; the City and Denver Defendants' Motion to Stay

---

[3]  Plaintiffs filed the Notice regarding Defendant Perea's criminal appeal on May 6, 2015 [#69].

Discovery [#73]; and the Denver Defendants' Motion to Dismiss [#81].[4] In turn, the City, Defendant Packman, and the Denver Defendants filed their respective Replies to the pending Motions to Dismiss and Motions to Stay [#70, #82, #83, #84, #85].

On June 10, 2015, Plaintiffs filed a Stipulation of Dismissal with prejudice of their Fourth Claim as to the City and Defendants France and Mercado [#87], and this Claim was dismissed as to these Defendants by an order of the court on June 16, 2015 [#89]. On June 12, 2015, I presided over a Hearing on the pending Motions, heard oral argument from Defendant Perea and counsel of Plaintiffs, Defendant Packman, the City, and the Denver Defendants, and took the Motions under advisement. [#88].

## LEGAL STANDARD

Under Rule 12(b)(6) a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations … and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). However, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Plausibility refers "to the scope of the allegations in a complaint: if they are

---

[4] Plaintiffs did not respond to Defendant Perea's Motion to Appoint Counsel.

so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008) (citation omitted). "The burden is on the plaintiff to frame 'a complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Id.* The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

Defendant Perea is proceeding *pro se*. Although Perea has not yet filed an Answer to the Amended Complaint, this court notes that "[a] *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). However, the court cannot be a *pro se* litigant's advocate. *Yang v. Archuleta*, 525 F.3d 925, 927 n. 1 (10th Cir. 2008).

## ANALYSIS

### A.      Fourteenth Amendment Claims

In the Amended Complaint's first two Claims for Relief, Plaintiff Estate asserts a claim for violation of Ms. Barela's Fourteenth Amendment substantive due process rights as to Defendants Hucksoll, Rhodes, Crawford, France, Mercado, and Packman, and a claim for violation of the Fourteenth Amendment Equal Protection Clause as to Defendants Hucksoll, Rhodes, Crawford, and Packman. [#33 at ¶¶ 68-134]. These Defendants are sued in their individual capacity. [*Id.* at ¶¶25-30]. The Denver Defendants and Defendant Packman argue that they are entitled to

8

qualified immunity because Plaintiffs have not alleged the violation of a constitutional right, and even if such a right exists, the pertinent law was not clearly established on November 18, 2012. [#52 at 3-13; #63 at 3-12].

Pursuant to § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ..."  42 U.S.C. § 1983.   To survive a motion to dismiss, a plaintiff must plead facts sufficient to support that (1) she had a right secured by the Constitution and laws of the United States that was violated; (2) by a person who acted under color of state law.   *Hall v. Witteman,* 584 F.3d 859, 864 (10th Cir. 2009).

Plaintiffs' First Claim for Relief is premised upon a violation of Ms. Barela's Fourteenth Amendment right to life, liberty, and bodily integrity.   [#33 at ¶ 73].   Specifically, Plaintiffs assert that Defendant Packman and the Denver Defendants had "a duty to perform emergency assistance to Ms. Barela."   [*Id.* at ¶ 72].   The Fourteenth Amendment protects citizens from the arbitrary, abusive, or oppressive use of governmental power.   *Daniels v. Williams,* 474 U.S. 327, 332 (1986).   However, the Fourteenth Amendment does not confer an "affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."   *Sanders v. Board of County Com'rs of County of Jefferson, Colorado*, 192 F. Supp. 2d 1094, 1106 (D. Colo. 2001) (citing *DeShaney v. Winnebago Cnty. Dept. of Soc. Serv.,* 489 U.S. 189, 196 (1989)).

1.      Qualified Immunity

The doctrine of qualified immunity "shields government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983 unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001) (quoting *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998) (internal quotation marks omitted).   Qualified immunity is an affirmative defense to § 1983 liability.   *See Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995).   Once a defendant asserts the defense, the plaintiff must demonstrate that qualified immunity is not proper by showing that "(1) the defendant's conduct violated a constitutional right and (2) the law governing the conduct was clearly established at the time of the alleged violation." *DeSpain*, 264 F.3d at 971 (quoting *Baptiste*, 147 F.3d at 1255).   In reviewing qualified immunity from § 1983 substantive due process claims, the court must first determine whether the plaintiff "has asserted a violation of a constitutional right at all."   *Siegert v. Gilley,* 500 U.S. 226, 231–33 (1991).   If Plaintiffs assert the violation of a constitutional right, the court then determines whether that right was clearly established so that reasonable officials in Defendants' situation would have understood their conduct violated that right.   *See Liebson v. New Mexico Corrections Dept.,* 73 F.3d 274, 276 (10th Cir. 1996).

a.      *Due Process*

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law."   U.S. Const., amend. XIV, § 1.   The Estate claims that Ms. Barela's substantive due process rights were violated when Defendants Hucksoll and Rhodes misrepresented to Ms. Espinoza that police were en route to the

10

home and when Defendants Packman and Crawford affirmatively delayed police dispatch by resetting the system timer a total of four times.   [#33 at ¶¶ 68-95].   The Denver Defendants and Defendant Packman argue that Ms. Barela did not have a liberty interest in police protection against Defendant Perea, and that even if such an interest exists, the supporting law was not clearly established.   [#63 at 3-10; #52 at 4-11].

The Due Process Clause forbids the State from depriving individuals of certain rights "without the due process of law," but its language does not mandate "minimum levels of safety and security" for the State's citizens.   *DeShaney*, 489 U.S. at 195-96 (the purpose of the Due Process Clause "was to protect the people from the State, not to ensure that the State protected them from each other.").   The *DeShaney* court contemplated two limited exceptions to the general rule.   A duty to protect may arise where (1) the individual is unable to protect him or herself as a result of restraints imposed by the state, thus creating a "special relationship"; and (2) state conduct "creates or enhances" danger sufficient to establish that duty.   *DeShaney*, 489 U.S. at 201.   *See also Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995).

Plaintiff Estate recognizes that substantive due process rights generally do not include state protection against private violence [#56 at 6], and argues that the state created danger exception applies here because Defendants took affirmative action that increased Ms. Barela's vulnerability to Defendant Perea.   Plaintiff Estate argues that it has stated a claim because Defendants' delay in dispatching the police placed Ms. Barela in a worse position than the one she had occupied before Ms. Espinoza summoned for help, thereby rendering Defendants responsible for providing protection.   [#33 at ¶ 86].

The Tenth Circuit first addressed the "state created danger" theory in *Graham v. Indep.*

11

*Sch. Dist. No. 1-89*, in considering whether the defendant school district had violated the due process rights of a student who was shot and killed while in the school's custody.   22 F.3d 991 (10th Cir. 1994).   In holding that the school district had neither entered into a custodial relationship with its students nor created or augmented the danger posed by the aggressors, the court noted that the state created danger doctrine "necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger."   *Graham*, 22 F.3d at 993-95.

In *Uhlrig v. Harder*, the Tenth Circuit was presented with a § 1983 action by the husband of a therapist killed by a mental hospital patient, and held that "the danger creation theory must ultimately rest on the specifics of a substantive due process claim—i.e. a claim predicated on reckless or intentional injury-causing state action which 'shocks the conscience.'"   64. F.3d at 572.   The court articulated the following test to determine whether a state defendant created or enhanced the special danger: 1) whether plaintiff was a member of a limited and specifically definable group; 2) whether defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; 3) whether the risk to plaintiff was obvious or known; 4) whether defendant acted recklessly in conscious disregard of that risk; and 5) if such conduct, when viewed in total, "shocks the conscience" of federal judges.   *Id.* at 574.

The Tenth Circuit, following *DeShaney*, subsequently held that "in addition to meeting *Uhlrig's* five-part test, a plaintiff must show that the charged state entity and the charged individual defendant actors created the danger or increased ... the danger in some way."   *Armijo v. Wagon Mound Public Schools,* 159 F.3d 1253, 1263 (10th Cir. 1998).   The Tenth Circuit's analysis focused on *creation* of danger:

> The key to the state-created danger cases ... lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of

> danger, effectively stripping a person of her ability to defend herself, or cutting off
> potential sources of private aid. Thus the environment created by the state actors
> must be dangerous; they must know it is dangerous; and, to be liable, they must
> have used their authority to create an opportunity that would not otherwise have
> existed for the third party's [acts] to occur.

*Armijo*, 159 F.3d at 1263 (quoting *Johnson v. Dallas Ind. Sch. Dist.,* 38 F.3d 198, 201 (5th Cir.

1994)).   Indeed, returning a person to a dangerous environment that was not *created* by the state is

simply not enough.   *Id.*

In their Amended Complaint (and their Responses to the Motions to Dismiss), Plaintiffs do

not allege that Defendants (1) placed Ms. Barela in the dangerous situation that Ms. Espinoza

witnessed, (2) rendered Ms. Barela unable to defend herself, or (3) made unavailable other

potential sources of aid.   Plaintiffs allege nonetheless that Defendant Packman and Denver

Defendants' conscious failure to act increased the danger that Defendant Perea posed to Ms.

Barela.   [#71 at 5-11; #81 at 5-13].   Despite the heartbreaking consequences, Defendants'

alleged inaction had no bearing on what caused the domestic dispute to ignite or what led

Defendant Perea to violence.   Nor do Plaintiffs allege that Ms. Barela was in state custody when

Mr. Perea attacked her.   And unlike in *Sanders*, the Amended Complaint, even taken in the light

most favorable to Plaintiffs, does not allege facts to support a finding that Defendants affirmatively

altered Ms. Barela's circumstances.   *See Sanders*, 192 F. Supp. 2d at 1110 (finding plaintiff pled

constitutional violation where decedent's survivable wounds turned fatal after defendants issued

orders refusing to permit access to or rescue of decedent for hours, including affirmatively

preventing decedents' companions from seeking other help and despite knowing that the assailants

who had initially shot decedent were no longer a threat).   While Plaintiffs insist that Ms. Espinoza

would have called Ms. Barela's son to report to the Barela home had Defendant Rhodes not

13

misrepresented the status of police dispatch, Defendants did not *prevent* Ms. Espinoza from placing that call. *Cf. Ross v. United States*, 910 F.2d 1422, 1431 (7th Cir. 1990) (allowing recovery for injury resulting from state prevention of private rescue attempt). In accepting as true the allegations that the Denver Defendants and Defendant Packman could have saved Ms. Barela's life had they taken certain action either by dispatching police sooner or conducting a more thorough investigation [*see* #33 at ¶¶ 56, 58 (time of death pronounced as between thirty minutes and one and a half hours after the police departed the dark and quiet house)], Plaintiffs' claims are premised on the Defendants inaction, rather than affirmative action that created the danger. *See, e.g., Estate of Sinthasomphone v. City of Milwaukee*, 785 F.Supp. 1343, 1349 (E.D. Wis. 1992) (noting Justice Brennan's distinction in the *DeShaney* dissent between a failure to act and an affirmative act).

Furthermore, Plaintiffs' allegations that Defendant Packman and the Denver Defendants are liable under § 1983 because they inaccurately assured Ms. Espinoza that police help was on the way [#33 at ¶¶ 88-89] do not state an actionable claim. The Tenth Circuit has affirmed that "false assurances do not constitute an affirmative act rendering decedent vulnerable to danger within the meaning of the danger creation exception." *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 925 (10th Cir. 2012) (affirming dismissal of complaint brought by survivors and estate of epilepsy patient who died at state hospital after caregivers falsely represented that he would remain under constant monitoring). *See also Lowman v. City of Aurora*, No. 10–cv–01259–MSK–MJW, 2012 WL 1269131 (D. Colo. April 16, 2012) (granting city defendant's motion for judgment on the pleadings that no constitutional violation resulted from emergency services' delay in responding to 911 call where decedent suffered fatal cardiac failure amidst several reassurances from dispatch

that help was on the way); *Robbins*, 519 F.3d at 1252 ("The allegations of 'lulling' and 'doing nothing' do not give rise to a reasonable expectation of relief, given that *DeShaney* requires an affirmative act before imposing liability.").

Accordingly, I do not pass upon the other *Uhlrig* factors because I find that Plaintiffs have not pleaded facts to demonstrate that the state actors created the danger that ultimately led to Ms. Barela's untimely demise. Based on the allegations as set forth in the Amended Complaint, I conclude that Plaintiffs have failed to plead a cognizable violation of the Fourteenth Amendment upon which to base their claim for violation of 42 U.S.C. § 1983.

b.    *Equal Protection Clause*

"The equal protection clause provides that '[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws.'" *Grace United Methodist Church v. City of Cheyenne,* 451 F.3d 643, 659 (10th Cir. 2006) (quoting U.S. Const. amend. XIV, § 1). "Equal protection 'is essentially a direction that all persons similarly situated should be treated alike.'" *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985)). However, "[e]qual protection of the laws doesn't guarantee equal results for all." *SECSYS, LLC v. Vigil,* 666 F.3d 678, 684 (10th Cir. 2012) (internal quotation marks omitted). Rather, the Equal Protection Clause "seeks to ensure that any classifications the law makes are made without respect to persons, that like cases are treated alike, that those who appear similarly situated are not treated differently without, at the very least, a rational reason for the difference." *Id.* (internal quotation marks omitted). Plaintiff Estate claims that Defendants Hucksoll, Rhodes, Crawford,[5] and Packman discriminated against Ms. Barela as a victim of domestic violence, as a resident of District 4, or as

---

[5] For the purposes of the Equal Protection Clause analysis I refer to these Defendants as the "Dispatch Defendants."

an individual in a class of one by intentionally allowing more time to pass before dispatching police to her home.   The Dispatch Defendants and Defendant Packman argue that Plaintiff Estate has not sufficiently alleged intentional discrimination, has not alleged that Ms. Barela is a member of a protected class, and does not satisfy the requirements for a class of one theory.   [#63 at 11-12; #52 at 11-14].

 "Although there is no general constitutional right to police protection, the state may not discriminate in providing such protection."   *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1110 (10th Cir. 2008).   The Tenth Circuit has recognized the potential for an equal protection claim where the victim of domestic violence established that she was intentionally treated differently from victims of nondomestic violence.   *Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 694 (10th Cir. 1988) (holding that plaintiff in suit against city and police department presented sufficient evidence in the form of statistical comparisons for domestic violence arrests versus nondomestic violence arrests and the disparate training that officers receive regarding whether to arrest domestic violence perpetrators versus nondomestic violence perpetrators so as to survive summary judgment on an equal protection claim).   The plaintiff has the burden of demonstrating discriminatory intent.   *Id.* (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265 (1977)).   The plaintiff need not "demonstrate that the challenged action was taken solely for discriminatory purposes; it is necessary only to prove that a discriminatory purpose was a motivating factor."   *Id.*

The first element of an equal protection violation requires a showing that one class of individuals was intentionally treated differently from another class of individuals "whose situations are arguably indistinguishable."   *Ross v. Moffitt,* 417 U.S. 600, 609 (1974).   *See also*

16

*Vigil,* 666 F.3d at 688 ("Before a court may get to the business of assessing the rationality of a challenged state action, some evidence of intentional discrimination against a particular class of persons must be present…").   The Supreme Court has recognized that a single plaintiff may bring an equal protection claim. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000).   The individual must likewise show he or she "was intentionally treated differently from others similarly situated." *Id.   See also Shifrin v. Toll*, 483 Fed. Appx. 446, 449 (10th Cir. 2012) (further quotation marks and citation omitted).   Accordingly, "a plaintiff must first establish that others, similarly situated in every material respect, were treated differently." *Kan. Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1214 (10th Cir. 2011) (internal quotation marks and citation omitted).   At the second step of the equal protection analysis, under heightened, intermediate, or rational basis review, the court assesses the adequacy of the reasons for the discrimination. *Vigil*, 666 F.3d at 689.[6]

I find that Plaintiffs have not stated an equal protection claim under any of the three proffered theories because they have not alleged facts that allow a factfinder to conclude that Defendants acted with the necessary intent to discriminate.   The relevant allegations are as follows:   The Dispatch Defendants and Defendant Packman dispatched police officers to the

---

[6] The court strictly scrutinizes government action that implicates a fundamental right or classifies individuals using a suspect classification, such as race or national origin, and the government carries the "burden of proving that [its] classifications are narrowly tailored measures that further compelling governmental interests."   The court applies intermediate scrutiny to government action that classifies people according to "a quasi-suspect characteristic, such as gender or illegitimacy," and the government must demonstrate that its classification serves "important governmental objectives" and is "substantially related to achievement of those objectives." Finally, the court applies a rational basis test where the challenged government action does not implicate either a fundamental right or a protected class, during which the court inquires whether the government's classification bears "a rational relation to some legitimate end." *Price-Cornelison*, 524 F.3d at 1109-1110 (citations omitted).   Plaintiff Estate concedes that rational basis review applies to all of its theories of an Equal Protection violation.   [#81 at 14].

Barela home 66 minutes after Ms. Espinoza first called 911.   [#33 at ¶ 106].   During the hours

prior to Ms. Espinoza's phone calls, District 4 had received reports of one robbery and two traffic

accidents.   [*Id.* at ¶ 107].   The robbery was reported to District 4 at approximately the same time

as Ms. Espinoza's first phone call, and police were dispatched to that emergency faster than to the

Barela home.   [*Id.* at ¶¶ 108, 110].   The two traffic accidents were resolved in less than one hour

measuring from the time each accident occurred until the time the officers left the accident scenes.

[*Id.* at ¶ 109]. On November 17, 2012 at 2:00 a.m., District 2 received a phone call reporting an

incidence of domestic violence and requesting emergency assistance.   [*Id.* at ¶ 114].   Police were

dispatched, arrived at the scene, and completed their investigation within 51 minutes.   [*Id.*]   The

Police Response Time Performance Audit of 2014 (the "Audit") identifies the average length of

time between a 911 Operator receiving a phone call, a 911 Dispatcher dispatching police, and an

officer arriving at the scene.   [*Id.* at ¶¶ 115-116].   According to the Audit, in 2012, the average

time between a 911 Operator receiving a priority call[7] and an officer arriving at the scene

("pick-up to arrive") was "just under" 15 minutes in District 4 and 12.9 minutes in all other Denver

police districts.   [*Id.* at ¶ 117].   In 2013, the pick-up to arrive time for priority calls was 16.32

minutes in District 4 and 14.3 minutes in all other Denver police districts.   [*Id.* at ¶ 118].   The

pick-up to arrive time in response to Ms. Barela's emergency was 70 minutes, "more than four

times as long as the average response time in District 4."   [*Id.* at ¶¶ 121-122].

While the court finds these allegations disconcerting, they do not demonstrate that

Defendants Hucksoll, Rhodes, Crawford, or Packman acted with specific discriminatory intent as

to Ms. Barela.   Plaintiff Estate argues it "compared how the 911 Defendants treated Ms. Barela's

---

[7] Priority call is defined as "emergency calls for service where a person, property, or life faces
imminent threat of danger, such as a robbery in progress."   [#33 at ¶ 116].

domestic violence assault to how they treated non-domestic violence calls in District 4 during the hours around her assault."   [#81 at 15].   To the contrary, Plaintiff does not allege that any of these individual Defendants were the dispatchers responsible for sending police officers to the traffic accident or robbery scenes in District 4 on November 18 or to the domestic violence scene in District 2 on November 17.   Nor does Plaintiff allege how these individual Defendants contributed to the pick-up to arrive times measured in the Audit.   *See Frazier v. Flores*, No. 14–cv–02600–GPG, 2014 WL 6517375, at *4 (D. Colo. November 20, 2014) (Babcock, J.) (dismissing equal protection claim in part because plaintiff did not allege that any of the defendants involved in the seizure of his personal property were the same individuals who did not seize another inmate's personal property).   There simply is no alleged nexus between the Dispatch Defendants or Defendant Packman's actions and any characteristic of Ms. Barela.   This "comparator evidence" illustrates at best how the Dispatch Defendants and Defendant Packman inadequately alerted the police in response to Ms. Barela's emergency compared to how an unnamed dispatcher alerted police to a third party victim's emergency.   *Cf. Price-Cornelison*, 524 F.3d at 1112-13 (holding question of fact as to equal protection violation where defendant undersheriff failed to enforce restraining order protecting lesbian domestic violence victim despite concurrently enforcing restraining order protecting heterosexual domestic violence victim).

The allegations asserted by Plaintiffs are tragic and chilling.   However, they fail to describe other similarly situated persons who were in fact treated differently by the same, individual defendants.   *See Jennings v. City of Stillwater,* 383 F.3d 1199, 1214 (10th Cir. 2004) ("When multiple variables are in play … the difference in treatment can be the product of a number of considerations, conscious or otherwise, many of them legitimate.").   This court

recognizes that "[o]ften, an equal protection plaintiff will be able to show intentional discrimination only by circumstantial evidence, usually in the form of an inference of discrimination arising from the fact that his or her adverse treatment was such a stark outlier from an otherwise consistent pattern of favorable treatment in similarly situated cases." *Vigil*, 666 F.3d at 689 (citing *Olech,* 528 U.S. at 564–65; *Washington v. Davis,* 426 U.S. 229, 242 (1976)). However, the inference of discrimination offered here relies on how dispatchers other than Defendants responded to 911 calls. [*See* #81 at 18]. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief" (*Kan. Penn Gaming, LLC*, 656 F.3d at 1215 (citation omitted)); and the current state of pleading standards requires more "than the threadbare allegation of different treatment to similarly situated individuals to defeat a motion to dismiss." *Shifrin*, 483 Fed. Appx. at 450 ("a generalized pleading…is no longer sufficient to state a class-of-one claim") (citation omitted).[8]   Finally, "dismissal is proper where a party offers only conclusory allegations that others are similarly situated, without any factual support plausibly suggesting similarities in all material respects." *Id.* (quoting *Kan. Penn Gaming*, 656 F.3d at 1220).

The allegations before me do not demonstrate that the Dispatch Defendants and Defendant Packman intentionally discriminated against Ms. Barela as a victim of domestic violence or a resident of District 4, nor do they establish that Defendants intentionally treated Ms. Barela differently from other female domestic violence victims within or without District 4.   Because I

---

[8] Indeed, Plaintiff Estate argues it has alleged "the specific type of discrimination that occurred, as well as the fact that the individual dispatcher defendants, including Defendant Packman, discriminated when providing police services," and cites to the following paragraphs of the Amended Complaint: ¶¶ 99, 102-104, 112, 119. [#71 at 12]. These paragraphs do not contain factual allegations, but merely restate the pleading elements for an equal protection claim.

find that Plaintiff Estate has not adequately pled the first element of an equal protection claim I do not apply a rational-basis review to the alleged discrimination.

Based on the foregoing findings, I conclude, without reaching the "clearly established" prong of the analysis, that the Denver Defendants and Defendant Packman are entitled to qualified immunity with regard to the First and Second Claims.

2.     Municipal Liability

Plaintiff Estate asserts that the City is liable for Deliberately Indifferent Training and Supervision and Deliberately Indifferent Failure to Adopt Policies Necessary to Prevent Constitutional Violations.   According to Plaintiff Estate, the City's policies and customs caused the Dispatchers and Officers to act in a way that violated Ms. Barela's constitutional rights.

A plaintiff suing a municipality under § 1983 for the acts of one of its employees must establish that a municipal employee committed a constitutional violation, and that a municipal policy or custom was the moving force behind the constitutional deprivation. *Myers v. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998) (citing *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978)).   A municipal liability claim is foreclosed in the absence of a constitutional violation by the individual defendants.   *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (per curiam).   *See also Jiron v. City of Lakewood,* 392 F.3d 410, 419 n. 8 (10th Cir. 2004).   In light of the above findings that the Amended Complaint does not state a plausible constitutional violation, I recommend dismissing the Third Claim for Relief.

**B.     State Law Claims**

Plaintiffs Cruz, the Rosas, and Roll assert Willful and Wanton Conduct Resulting in Wrongful Death as to Defendants Hucksoll, Rhodes, Crawford, and Packman and Felonious

21

Killing Resulting in Wrongful Death as to Defendant Perea.   While it may exercise supplemental jurisdiction over state law claims in any case in which it exercises original jurisdiction, a district court may also decline to exercise supplemental jurisdiction over state law claims when the district court has dismissed all claims over which it has original jurisdiction.   *Koch v. City of Del City,* 660 F.3d 1228, 1248 (10th Cir. 2011) (citing 28 U.S.C. § 1367(c)(3)).   *See also Smith v. City of Enid ex rel. Enid City Comm'n,* 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").   Given my findings with respect to the federal § 1983 claims, I conclude that the state court is a more appropriate forum to adjudicate the state law claims and I respectfully recommend that this court decline to exercise jurisdiction over Plaintiffs' claims for Willful and Wanton Conduct and Wrongful Death.

## CONCLUSION

For the foregoing reasons, I respectfully RECOMMEND that:

1.      Defendant City and County of Denver's Motion to Dismiss [#42] be GRANTED;

2.      Defendants Hucksoll, Rhodes, Crawford, France, and Mercado's Motion to Dismiss [#63] be GRANTED;

3.      Defendant Packman's Motion to Dismiss [#52] be GRANTED;

4.      Plaintiffs' Amended Complaint [#33] be DISMISSED without prejudice.[9]

---

[9] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego,* 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for

Consistent with this Recommendation, IT IS ORDERED:

5.     Defendant Perea's Motion to Stay [#41] is GRANTED, and discovery with respect to Defendant Perea is STAYED until at least District Judge Blackburn has an opportunity to rule on this Recommendation;[10]

6.     The Motion to Appoint Counsel [#48] is DENIED, with leave to refile should the court exercise supplemental jurisdiction over the state law claims;

7.     The Motion for Extension of Time [#49] is GRANTED, and Defendant Perea need not respond until at least District Judge Blackburn has an opportunity to rule on this Recommendation;

8.     Defendant Packman's Motion to Stay Discovery [#54] is GRANTED;

---

appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

[10] Even if the court exercises supplemental jurisdiction, the undersigned Magistrate Judge recommends staying the action with respect to Defendant Perea due to his pending criminal appeal and this court's concern regarding his ability, particularly as a *pro se* litigant, to protect his Fifth Amendment rights during the pendency of the appeal and as a participant in the discovery phase in this matter. *See, e.g., AIG Life Ins. Co. v. Phillips*, Civil Action No. 07-cv-00500-PSF-MEH, 2007 WL 2116383 at *2 (D. Colo. July 20, 2007) (articulating five factors for the court to consider in determining whether a stay is appropriate).

9.      The City and Denver Defendants' Motion to Stay Discovery [#60] is GRANTED; and

10.     Within fourteen days of District Judge Blackburn's ruling on this Recommendation, to the extent that any of Plaintiffs' Claims survive, the remaining Parties should meet and confer regarding a proposed Scheduling Order and file the same with the court.

DATED: June 23, 2015                          BY THE COURT:


                                              s/Nina Y. Wang_____
                                              United States Magistrate Judge